MARK BECK LAW, PC
John Hanusz (SBN 277367)
Email: jhanusz@markbecklaw.com
350 West Colorado Boulevard, Suite 200
Pasadena, California 91105
Telephone: (213) 596-7828

MORRISON COHEN LLP
Jason Gottlieb (*pro hac vice* forthcoming)
Email: jgottlieb@morrisoncohen.com
Modupeolu Adegoke (*pro hac vice* forthcoming)
Email: dadegoke@morrisoncohen.com
909 Third Avenue
New York, New York 10022
Telephone: (212) 735-8600
Facsimile: (212) 735-8708

Attorneys for Plaintiffs Vitaly Anaykin and Konstantin Bondarev

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

VITALY ANAYKIN and
KONSTANTIN BONDAREV,

          Plaintiffs,

    v.

NIKOLAY EVDOKIMOV and
CRYPTONOMICS CAPITAL,

          Defendants.

Case No. 19-CV-8165

**COMPLAINT FOR VIOLATIONS OF THE EXCHANGE ACT, THE SECURITIES ACT, AND COMMON LAW FRAUD**

1
COMPLAINT

## COMPLAINT

Plaintiffs Vitaly Anaykin and Konstantin Bondarev ("Plaintiffs") make this Complaint for violations of Sections 10(b), 20(a), and 21(d) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5; Sections 5, 12 and 15 of the Securities Act of 1933 (the "Securities Act"), and for common law fraud under California law, and allege as follows based upon personal knowledge with respect to their own accounts, and upon information and belief as to all other allegations:

## NATURE OF THE ACTION

1.      In October 2017, Defendant Nikolay Evdokimov created Cryptonomics Capital ("Cryptonomics").  Cryptonomics aimed to allow the general public, through funds controlled by the company, to invest in initial coin offerings ("ICOs") for multiple cryptocurrencies.

2.      Cryptonomics was a fraud.  It was unregistered in any way with any U.S. regulator.  Evdokimov's promises were lies.  Cryptonomics operated outside the law.  And it failed.  Evdokimov took his investors' money, and then abandoned the project, leaving his investors in the lurch.

3.      Investment in Cryptonomics' funds required an investor to invest either cash or Bitcoin ("BTC").

4.      Each fund or "Portfolio" was allegedly unique, in that each contained carefully selected ICO projects.  Each Portfolio promised a different return on investment, ranging from 50% to 700%.

5.      Cryptonomics' pitch was that investors could rely on Cryptonomics' experts, analysts, and advisers to choose the most profitable ICO projects. According to its website, investors would not be making high-risk cryptocurrency investments if they used Cryptonomics' formula.  Using Cryptonomics' investment scheme, the company guaranteed expert advice,

2

COMPLAINT

transparency during the investment process, and higher potential for positive returns.

6. In their advertising and information documents, Defendants claimed that their funds were developed by experts who created an effective screening and evaluation system to determine profitable and successful ICO projects. In essence, Defendants claimed that by using this algorithm, an investor was guaranteed a successful investment.

7. Defendants claimed that their investment scheme was different from other cryptocurrency-based funds because it had a unique and exclusive range of investment products in the ICO and cryptocurrency market. Defendants asserted that by investing in Cryptonomics' Portfolios, an investor could minimize risk, while maximizing return on investment.

8. Cryptonomics continually advertised that its success could be seen not only by the amount "reimbursed" to investors since its inception, but also by its initial number of investors. Cryptonomics claimed that within the first six months of its inception, its investment scheme drew more than 20,000 investors from 84 countries, allowing the company to grow rapidly. Defendants advertised that since the establishment of Cryptonomics Capital, the company had disbursed an average of 541 BTC to 1106 BTC to its investors.

9. Cryptonomics' marketing materials proclaimed that Cryptonomics offered a unique investment opportunity to invest in mature startups. According to Cryptonomics, this opportunity, coupled with its experts choosing the ICO projects, would guarantee low risk and favorable returns on investments. This marketing pitch was a fantasy. But Cryptonomics continued to pretend that it had a unique, infallible formula; stating that its own experts would find only the most profitable ICO projects.

10. In truth, Defendants knew all along that they could never legally run their online platform.

3

11.     Defendants failed to register with the United States Securities and Exchange Commission ("SEC"), the United States Commodity Futures Trading Commission ("CFTC"), or any other potentially relevant regulator.  Defendants knew or reasonably should have known registration was required, as the SEC had previously stated, repeatedly, that ICOs may be issuances of securities that must comply with federal securities laws; and the SEC and CFTC had filed numerous lawsuits against individuals and companies for the unlawful issuance of cryptocurrencies that are securities or commodities.

12.     Indeed, the SEC has recently sued Evdokimov and ICOBox, another company which he controls, for a similar unregistered securities offering, "as well as the unregistered broker activities related to securities offered by ICOBox's clients, exposing thousands of investors to risky investments without providing the necessary information and protections required by the federal securities laws."  *See* Complaint, *SEC v. ICOBox and Nikolay Evdokimov*, No. 19-CV-8099 (C.D. Cal, filed Sept. 18, 2019) ("ICOBox Complaint").

13.     Based on Cryptonomics' promises, advertisements, and numerous other assurances and guarantees of a successful profit return, Plaintiffs, beginning on or around November 2017, made a series of deposits into funds controlled by Evdokimov and Cryptonomics.

14.     Defendants continued to solicit and successfully raise funds from other similarly situated investors through 2018.   Defendants also continued to advertise that investors were receiving positive returns on their investments. Additionally, Evdokimov, in a series of marketing videos, maintained his confidence in Cryptonomics, stating that all payments to investors would be made, even if he had to do it personally.

15.     However, Evdokimov has now abandoned Cryptonomics.  The current version of the Cryptonomics website, while still advertising for new investors, mostly contains inoperable links.  Additionally, Defendants have not

4

COMPLAINT

responded to requests for the refund of Plaintiffs' investments, nor have they contacted Plaintiffs regarding the status of their investments at any time. Defendants have failed to make any payments to Plaintiffs on their fairly sizable investments. And Evdokimov failed to respond in any way to a demand letter, or a text message containing a demand. This lack of communication is a clear indication that Defendants had no intention of fulfilling the guarantees made on their website, nor refunding Plaintiffs' investments.

16.     Defendants' fraudulent actions and omissions have led to the total loss of Plaintiffs' investments. As a result of Defendants' fraud and multiple violations of the federal securities laws, Plaintiffs are entitled to rescission of their investments, and damages for breach of contract and fraud.

## **THE PARTIES**

17.     Plaintiff Vitaly Anaykin ("Anaykin") is a Russian citizen domiciled in Montenegro.

18.     Plaintiff Konstantin Bondarev ("Bondarev") is a Russian citizen domiciled in Thailand.

19.     Defendant Nikolay Evdokimov ("Evdokimov"), the founder of Cryptonomics Capital, is a Russian citizen, and upon information and belief resides at 1240 Benedict Canyon Drive, Beverly Hills, California 90210-2727 and 725 North Foothill Road, Beverly Hills, California 90210. Evdokimov is also listed as the founder of many now-defunct cryptocurrency companies, and currently serves as managing partner of a company that purports to provide OTC Bitcoin trades worldwide for institutional investors and others. Evdokimov has never been registered with the SEC in any capacity or associated with any registered broker-dealers.

20.     Defendant Cryptonomics Capital ("Cryptonomics") is a Switzerland Corporation with its principal place of business at 4 Embarcadero Center, San

Francisco, California 94111.  Upon information and belief, it was incorporated in Switzerland in 2018, but has been operating since at least 2017 from its office in the Northern District of California.

## JURISDICTION AND VENUE

21.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); Section 22 of the Securities Act (15 U.S.C. § 77v); and Section 27 of the Exchange Act (15 U.S.C. §§ 78u(e) and 78aa), because Plaintiffs allege violations of Sections 10 and 20 of the Exchange Act, Rule 10-b5, and Sections 5, 12, and 15 of the Securities Act.

22.   This Court has supplemental jurisdiction over Plaintiffs' California law fraud claim pursuant to 28 U.S.C. § 1367(a), because the fraud claim is so related to Plaintiffs' claims under the Exchange Act and Securities Act that it forms part of the same case or controversy.

23.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. §§ 78v and 78aa, because Defendants are found, and/or reside, and/or are inhabitants of, or transact business within this District.  Venue is also proper in this District because many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.  In addition, venue is proper in this district because Defendant Nikolay Evdokimov resides in this district.

## FACTUAL ALLEGATIONS

**I.    Blockchain Technology and Initial Coin Offerings**

24.   A "blockchain" is essentially a digitized, decentralized, public ledger that cryptographically records, preserves, and presents information.  The general idea is that each "block" contains information, such as details on transactions that are made.  After a "block" is created (with cryptography to

6

verify its contents), the information inside of it cannot be changed.  The "block" then becomes part of the "blockchain," and an encrypted version of the information contained therein becomes publicly available along with all the previous "blocks" in the chain.   After this process is complete, another block is created with additional information, and so on.

25.    To date, most "blockchains" are used to record transactions involving virtual currencies, such as Bitcoin (BTC) and Ether (ETH).  However, a "blockchain" could be used to record all types of information.  For example, a blockchain could be used for deed recordation/transfers or even transfers of stock certificates.

26.    An ICO is a capital raising event in which an entity offers investors a unique "coin" or "token" in exchange for consideration – most commonly in the form of established virtual currencies like BTC and ETH – or fiat currency. These tokens are issued on a blockchain and are oftentimes listed on online platforms, called virtual currency exchanges, where they may be traded for virtual or fiat currencies.

27.    To participate in an ICO, investors are typically required to transfer virtual currencies to the issuer's address, online wallet, or other account.  During an ICO, or after its completion, the issuer will typically distribute its unique "tokens" to a participant's unique address on the blockchain.  Similar to stockholders in an IPO, holders of these tokens are often entitled to certain rights related to a venture underlying the ICO, such as profits, shares of assets, use of certain services provided by the issuer, and/or voting rights.

## II.    The SEC's View of Cryptocurrency Tokens

28.    The SEC raised alarms early about cryptocurrency, warning of Ponzi schemes involving virtual currencies in July 2013, and cautioning investors about Bitcoin and other virtual currency investments in May 2014.

COMPLAINT

29.     On July 25, 2017, the SEC issued a landmark report concluding that the tokens of a company called "The DAO" were securities, and thus they should have been registered with the SEC.  *See* Exch. Act Rel. No. 81207 (July 25, 2017) (the "DAO Report").  That report "[p]ut the digital asset industry on notice that many digital assets … are securities under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and subject to the federal securities laws, including registration requirements."  ICOBox Complaint ¶ 5.

30.     Evdokimov was well aware of the DAO Report by the time of the Cryptonomics offering, publicly discussing its significance, including in an interview with Reuters and in communications with potential investors.

31.     The SEC followed its analysis in the DAO Report with an August 28, 2017 investor alert about public companies making ICO-related claims, including "pump-and-dump" and market manipulation schemes.  The SEC also issued trading suspensions against certain issuers for making claims regarding their ICOs.  On December 11, 2017, SEC Chairman Jay Clayton released a statement which stated, "By and large, the structures of initial coin offerings that I have seen promoted involve the offer and sale of securities and directly implicate the securities registration requirements and other investor protection provisions of our federal securities laws."

32.     On February 6, 2018, Chairman Clayton told the U.S. Senate Committee on Banking, Housing, and Urban Affairs that "platforms that provide for trading in such securities must register with the SEC as national securities exchanges or operate pursuant to an exemption from such registration," and that "those who operate systems and platforms that effect or facilitate transactions in these products that they may be operating unregistered exchanges or broker-dealers that are in violation of the Securities Exchange Act of 1934."

33.     Following these announcements, the industry was on notice that token offerings such as ICOs would likely be considered securities offerings,

8

COMPLAINT

subject to the federal securities laws; and that funds such as Cryptonomics may be considered a broker-dealer operating on an unregistered basis.

**III.   Nikolay Evdokimov and Cryptonomics Capital**

34.     Upon information and belief, Cryptonomics Capital is a Swiss company founded by Nikolay Evdokimov and is operated by Evdokimov out of offices in San Francisco.

35.     While Evdokimov is listed as the "Strategic Advisor" for Cryptonomics, he has been repeatedly cited as the founder and guiding force of the company.  In a video promoting Cryptonomics, Evdokimov introduced himself as the "Co-founder and vision director of ICOBox, and head of the Cryptonomics fund."[1]

36.     Cryptonomics advertised that "over 80 specialists evaluate the ICOs before the token is added to the portfolio."  (*See* screenshot below.)  However, Cryptonomics has, at most, five employees.  Currently, only two employees are advertised as working at Cryptonomics.



---

[1]     *See* https://www.youtube.com/watch?v=s8byZszn2do.  In the cited video, Evdokimov says in Russian: "Меня зовут Николай Евдокимов я являюсь вижн директором компании ICOBox, а также руководителем платформы криптономикс."  For the Court's convenience, Plaintiffs provide all Russian quotes in their original Russian, and English translations.

COMPLAINT

### IV.    Cryptonomics Capital and the Promise of Investments in Profitable ICOs

37.    Cryptonomics publicized its business model on or around October 2017 via its website, https://www.cryptonomics.io.

38.    Cryptonomics advertised that potential investors, without prior knowledge of cryptocurrency, would be able to invest in ICOs and blockchain technology.

39.    Specifically, Cryptonomics' website stated:

> **Earn on investments in profitable projects without knowledge in the field of ICO and blockchain technologies**
>
> The fund conducts a thorough analysis of ICO projects, provides the investor with a list of promising projects with a point of investment attractiveness, helps to buy tokens with the maximum discount in the market and gives recommendations on the sale of tokens with profit.

40.    In the Cryptonomics model, Cryptonomics would act as the intermediary, choosing which ICO projects to invest in, selling the resulting token, and divesting a portion of the original proceeds back to the original investor.

41.    This model, according to a September 2017 Cryptonomics presentation, attracted more than "38,000 investors from 95 countries" to the company, and was causing Cryptonomics to be the "number one on the crypto investment market."

42.    Cryptonomics' business model bore all the characteristics of an investment in an investment contract under the *Howey* test:  investors invested of money in a common enterprise, and were led to expect profits solely from Cryptonomics' efforts.

43.    Further, by advising on investments, providing investment advice, and helping to effect transactions in securities on behalf of investors, Cryptonomics was acting as a broker-dealer, as well as an investment adviser.

As it turns out, Cryptonomics was not registered with any regulatory agency to perform any of this activity.

***Evdokimov's Knowledge and Intent***

44.     Evdokimov was well aware of the SEC's position on unregistered securities offerings.

45.     Evdokimov gave interviews (including to Reuters) and made statements online about his interpretation of the DAO Report, incorrectly claiming that his ICOBox's token offering was not a security or had an "exemption" from registration because the token had a "utility." According to an article posted on Reuters.com and other sites on July 27, 2017, ICOBox founder told Reuters their ICOs have utility. In the following days, ICOBox and Evdokimov commented on the article on the company's Twitter account, including posting on July 30, 2017 that "Nick Evdokimov said our tokens have a utility, the most likely exemption." Evdokimov did not say what that purported utility was or how that would constitute an exemption from securities laws.

46.     ICOBox received multiple questions on Telegram, a digital messaging service, from potential investors as to whether the company was able to offer ICOBox tokens broadly to all U.S. investors, given the apparent application of the federal securities laws. Management responded that it could (and did) sell to U.S. investors and the company did not require information from purchasers to assess whether they were accredited investors. For example, on Telegram on August 25, 2017 (in the midst of an ICO), a potential investor asked, "Can ICOS tokens be bought in the US? I saw there could be regulations in the US for ICOs, is your team knowledgeable on that? I didn't see any identity verification to get some of your tokens, whereas other groups . . . had a very strong vetting process to avoid issues with the SEC." An ICOBox team member responded:

"Yes, you can purchase them while in U.S. SEC's press release is not a new law.  It stemmed from the investigation of a specific company, The DAO, which issued its tokens. In fact, The DAO's tokens were securities, but the company was selling then in violation of the laws regulating securities market.  However, not all tokens are securities by default.  In addition to laws which define what is and is not a security, there exists a large volume of court decisions on the issue. Court decisions also define the criteria which help determine if a particular transaction is a security.  Depending on the situation the term 'token' may mean both securities and other financial tools, and this fact was adequately reflected in SEC's press release.  Our tokens are not securities.  They are a product which has its purpose and functions.  Because ICOS token is not a security, its sale does not require registration."

These false statements demonstrate an awareness of the DAO Report.  Similar to his sale of the ICOS token, Evdokimov's sale of the Cryptonomics tokens were also unregistered sales of securities, which he knew full well at the time.

***Evdokimov's Self-Interest***

47.     In an October 2017 presentation, Cryptonomics described an investment scheme vastly different than its current setup.  In its prior investment scheme, investors were originally required to deposit a minimum of 0.015 BTC (approximately US$142 at the time[2]) in an account controlled by Cryptonomics, not, as further explained below, into a specific Portfolio.  This investment scheme also involved the use of a company called ICOBox.

48.     According to its website, ICOBox brands itself as 'the world's most experienced ICO/STO service provider."

49.     From the October 2017 presentation, Evdokimov stated that a portion of the invested funds would be used to pay for ICOBox's services.

50.     According to Evdokimov's LinkedIn profile, Evdokimov has been, and is currently, the Vision Director for ICOBox since July 2017.  The company's own press release reveals that Defendant Evdokimov is the founder

---

[2]     This minimum deposit was increased to 0.07 BTC (approximately US$665) in February 2018.

and owner of ICOBox.  He also returned in December 2018 to once again be the company's CEO.

51.     Evdokimov thus had a vested interest in ICOBox.  The use of Evdokimov's ICOBox company to handle funds from Cryptonomics' investors was an intermingling of funds between the two companies, the extent of which was undisclosed to investors.

52.     On September 18, 2019, ICOBox and Evdokimov were sued by the SEC for issuing unregistered securities, and for acting as a broker-dealer without registering in any way with the SEC.  *See generally* ICOBox Complaint.  As stated in that Complaint, "Neither ICOBox nor Evdokimov have ever been registered with the SEC in any capacity, or associated with any registered broker-dealers."  *Id.* at ¶ 116.

***Cryptonomics' Investment Portfolios and its Promises of Profits***

53.     Between October 2017 and March 2018, Defendants revamped their investment scheme, allowing investors to choose which Portfolio to direct their investments.  At the time of Plaintiffs' initial investments (November 2017), Defendants offered investors the opportunity to either invest in Portfolio 1 or 2.  (While a third portfolio option was originally slated for 2018, it never came into fruition.)  It was through the use of these Portfolios that Cryptonomics guaranteed investors that they would receive profitable returns.

54.     With Portfolio 1, Defendants promised that if an investor contributed the minimum investment, it would receive a 50% return on its investment within two months.  ("The fund takes all the work on itself, and you earn 50% of the profits on invested capital in passive mode.")

55.     In a video posted on Cryptonomics' YouTube channel, Evdokimov claimed that the use of Portfolio 1 would result in a favorable investment: "We return to our investors in the first portfolio, for example on investing 100 Bitcoin, we return 150 Bitcoin in a well-regulated time frame, two months, that is, so for

a cycle of two months from the moment of investment for each invested bitcoin, we return one and a half.  The economy is all in bitcoins.  Naturally, 50% in two months is 1113% per annum, and this is essentially the volume of risk-free investments, since the sale of these tokens does not depend on any external factors."[3]

56.     Cryptonomics further alleged that pursuant to Portfolio 1, the investments were not dependent on the outcome of the ICO or when the related token would go public.

57.     Under Portfolio 2, Defendants advertised a 700-plus percent return on investment within four to eight months if the investor made a minimum deposit.  (*See* screenshot below.)  With Portfolio 2, a team of allegedly "over 80 specialists evaluate the ICOs before the token is added to the portfolio" with the experts using a "stringent system [for] … projects selection."  Following this expert analysis, each project would be given an attractiveness score, which would serve as the basis for the project selection.



---

[3]     *See* https://www.youtube.com/watch?v=og9hka7rT2g.  In the original Russian: "Мы возвращаем нашим инвесторам, первого портфеля на их условно говоря 100 биткоинов вложенных, возращаем 150 биткоинов в четко зарегулированное время, за 2 месяца, то есть за цикл два месяца от момента инвестиции на каждый вложенный биткоин мы возвращаем полтора, экономика вся в биткоинах. Естественно 50% за 2 месяца - это 1113% годовых , вот и это по сути объем без рисковых вложений поскольку реализация этих токенов не зависит не от каких внешних факторов."

COMPLAINT

58.     While the above chart claims a 700% rate of return as its floor, Evdokimov has claimed even higher returns.  When asked by an audience member "what is the average percentage that will be received by people who invested in the 2nd portfolio during the year, what percentage will they approximately receive?"  Evdokimov replied, "I think it will be around 900%, if we talk in bitcoins."[4]

59.     Moreover, in a Q&A session recorded and posted on Cryptonomics' YouTube channel, an audience member posed the following question to Evdokimov:  "The return on the second portfolio is 6000% per year in dollars, right?"  Evdokimov replied, "Yes of course."[5]

60.     Cryptonomics also promised a "Portfolio 5," which "guaranteed profitability" of 10% "regardless of bitcoin rate."  As set forth in Cryptonomics' presentation, still available on its website as of this filing:



---
4    *See* https://www.youtube.com/watch?v=og9hka7rT2g.  In the original Russian: "какой на ваш взгляд, лично как вы думаете, средний процент получат люди инвестировавшие во 2-й портфель в течении года, какой процент они примерно получат?" Evdokimov's reply: "Я думаю, что там порядок цифр, порядка от 900%, если говорить в биткоинах."

5    *See* https://www.youtube.com/watch?v=b1i1qyVh4o4.  The original exchange occurred in Russian.  Audience member: "Доходность второго портфеля 6000% в год в долларах, правильно? Evdokimov's reply: "Ну, да конечно."

15

COMPLAINT

*Bonus Compensation Structure*

61.     Defendants also alleged that investors could receive profits through Cryptonomics' unilevel compensation structure.  Essentially, an investor would receive a one-time 4% commission for personally recruiting affiliates ("first level" recruits), and would continue to receive commissions based on the recruited affiliates also recruiting new investors.  Thus, in this payment plan, an affiliate sits at the top of the unilevel team and everyone personally recruited by the affiliate comes directly below them.  Once the affiliates in the first level start recruiting new affiliates, the new members are placed on the second level and the structure continues growing.

62.     This bonus referral system consequently encouraged the creation of teams where profits would stem not from ICO projects but from recruiting investors.

63.     Thus, not only was Cryptonomics selling investment contracts without any registration or exemption, Cryptonomics was incentivizing people to act as unregistered broker-dealers to sell these investment contracts.  Cryptonomics was not licensed to conduct such business.

## V.     Cryptonomics Misrepresents its Investment Scheme and Profits

64.     Cryptonomics' entire investment model was fictitious.

65.     First, Defendants originally claimed that their experts stringently reviewed and analyzed each potential investment into an ICO project.  Defendants, in February 2018, claimed that "[o]ver 80 specialists evaluate the ICOs before the token is added to the portfolio."  However, no more than five people at a time have been listed as working for Cryptonomics.

66.     Second, these supposed experts have allowed investments into ICOs that never appeared to be financially sound.  One such ICO project was Decenturion, whose token was known as "DCNT."  Unveiled in May 2018, Decenturion claimed to be the world's first blockchain state, not controlled by

any central person or entity.  Investors in Decenturion were considered citizens, did not pay taxes, and would have received tokens for free.  Decenturion, which no longer has a functioning website, was established by Defendant Evdokimov who thus, once again, had a clear stake in a company intertwined with Cryptonomics.

67.    Decenturion's cryptocurrency was also a security that had not been registered, nor did it qualify for any exemption.

68.    Cryptonomics led investors to believe the projected values of Decenturion for 2018 would skyrocket:



69.     Today, Decenturion is defunct.  After an initial value of US$1372.00 (reaching as high as $1,480.00), the value of Decenturion's cryptocurrency is currently less than US$0.05, as shown below:



70.     Thus, despite Cryptonomics' assertions that its experts were diligently reviewing each ICO project which would allow for low-risk investments, and despite Cryptonomics' guarantees of high returns, Cryptonomics invested funds in a non-established ICO, which was run by Evdokimov, from a company that had little support from the cryptocurrency community, and quickly collapsed.

71.     Third, and notwithstanding the lack of experts and the questionable investments, Defendants continued assert to state in videos and presentations that their investments would "guarantee success."

72.     In numerous videos, posted both on their website and YouTube Channel, Defendants promise a high rate of return,[6] promise to return all funds

---

[6]     *See* https://www.youtube.com/watch?v=_QDNrcVePtQ.

18
COMPLAINT

invested in Portfolio 2,[7] and promise that if an investor fails to see a return on his investment, Defendant Evdokimov would personally take a loan to repay the investment.[8]

73. Additionally, from December 30, 2017 to July 30, 2018, Cryptonomics proclaimed monthly that investors were receiving profits from their investments. However, as further discussed below, this was a fraud: Plaintiffs did not receive any profits from their investments with Defendants.

***Other Omissions and Misrepresentations***

74. Defendants were legally obligated to register with the Financial Industry Regulatory Authority ("FINRA") as a broker-dealer in order to operate their stated business.

75. The SEC has repeatedly stated that token offerings to raise equity in a company are almost always securities offerings. Brokerage activity in such security tokens would require registration as a securities broker-dealer. Cryptonomics never sought registration – even after the SEC had publicly and repeatedly told the market how it viewed cryptocurrency offerings or unlicensed cryptocurrency broker-dealers.

76. Defendants' omissions and misrepresentations are also present in their advertising. Since the inception of Cryptonomics, Defendants have posted YouTube videos touting the success of the company, the potential profits, and the low-risk investments. These videos even stated that Defendant Evdokimov would personally refund any investments that were not profitable. In a video posted on YouTube on November 14, 2018 (https://www.youtube.com/watch?v=pbc6E7Gsy6U), Evdokimov specifically states that "Cryptonomics Capital will pay back all the funds in Portfolio 2."

---

[7]  *See* https://www.youtube.com/watch?v=pbc6E7Gsy6U.

[8]  *See* https://www.youtube.com/watch?v=Xklm53Jqy-4.

COMPLAINT

However, these advertisements and statements were again fraudulent. Evdokimov's repeated promises and history of collapsed cryptocurrency projects demonstrate that he knew that there was no way he could repay investors at the time he was making these promises.

77.    Defendant Evdokimov has demonstrated a clear pattern and practice of raising funds for a cryptocurrency-related business and then either allowing that business to stagnate (like Cryptonomics) or become defunct (like his former company Stable Coin S.R.L.).

78.    Plaintiffs would not have invested with Cryptonomics if all of this material information, including Evdokimov's past history and his failure to properly register his companies, had been previously disclosed.

**VI.    Plaintiffs' Investments with Cryptonomics**

79.    Beginning in November 2017, Plaintiffs made a series of investments with Cryptonomics.

80.    Defendants described the opportunity as the ability to make safe cryptocurrency-related investments without any prior knowledge of the industry.

**A.    <u>Plaintiff Anaykin's Investments with Cryptonomics</u>**

81.    From December 11, 2017 to January 15, 2018, Mr. Anaykin made a series of deposits with Cryptonomics.  These deposits, in Bitcoin, were (at the time) worth approximately US$678,260.36.  Mr. Anaykin divided his investments between Portfolio 1 and 2.

82.    On June 17, 2018, Mr. Anaykin made additional deposits into both Portfolio 1 and 2.  These deposits, in bitcoin, were (at the time) worth approximately US$270,598.71.

83.    Mr. Anaykin's total investment sum for both Portfolios was thus valued at US$948,859.07.

84.    The above is not inclusive of the bonus (2.631 BTC), also owed to Mr. Anaykin as well.

85.    Mr. Anaykin did not receive any profits from his investments with Defendants, despite Defendants' continued assertions that they reimbursed their investors throughout 2018.

**B.    Plaintiff Bondarev's Investments with Cryptonomics**

86.    From the beginning of 2018, Mr. Bondarev made a series of deposits with Cryptonomics.  These deposits, in Bitcoin, were (at the time) worth approximately US$121,600.00.  Mr. Bondarev divided his investments between Portfolio 1 and 2.

87.    Mr. Bondarev did not receive any profits from his investments with Defendants despite Defendants continued assertions that they reimbursed their investors throughout 2018.

**VII.    Cryptonomics' Violations of Federal Securities Laws**

88.    Under Section 5 of the Securities Act, all issuers must register non-exempt securities with the SEC.  Unless a registration statement is in effect as to a security, it is unlawful for any person, directly or indirectly, (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

89.    Cryptonomics did not meet any relevant exemption.  Since Cryptonomics operated out of the United States, Defendants were required to comply with the rules for such exemptions.  However, Defendants failed to comply with the securities laws, in numerous ways.

90.    First, upon information and belief, Defendants have not filed any paperwork with the SEC or any other regulatory body indicating registration or a regulatory exemption.

91.     Second, Defendants failed to comply with the express investor protection conditions of Rule 506(c), by failing to verify the accredited investor status of each investor.

92.     Third, Defendants failed to comply with Section 502(d) by failing to exercise reasonable care to assure that the purchasers of the securities were not underwriters within the meaning of Section 2(a)(11) of the Securities Act.

93.     Further, Cryptonomics was effectively operating a broker-dealer. However, Cryptonomics was not registered as a broker-dealer, and Evdokimov has never been registered with the SEC in any capacity, or associated with any registered broker-dealers.

## VIII. Defendants Refuse to Refund Any Investments

94.     Defendants have not only refused to disclose to investors how investor funds have been used in the past, or are currently being used, but also have refused to refund Plaintiffs' investments.  Upon information and belief, Defendants continue to hold investors' funds but are no longer making investments through Cryptonomics.

95.     Upon information and belief, Cryptonomics has dissipated its funds to the point where it may no longer be a viable business.

96.     In short, Defendants' false claims and promises – which they knew at the time were impossible – have collapsed.  Yet they continue to hold Plaintiffs' money.

# CAUSES OF ACTION

## COUNT I

**VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5**

**(Against All Defendants)**

97.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

98.     This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, against all Defendants.

99.     Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, employed devices, schemes, or artifices to defraud, and engaged in acts, practices, and courses of business which operate or would operate with fraud or deceit.

100.    Defendants made untrue statements of material fact and omitted material facts necessary in order to make the statements appear, in light of the circumstances under which they were made, not misleading.

101.    The misrepresentations and omissions alleged herein include:

    a.     Failure to disclose all the risks associated with Cryptonomics' business model, and indeed providing false comfort by making statements indicating that it would be a profitable investment scheme;

    b.     Repeatedly making false statements regarding the profitability of investing with Cryptonomics Capital, including repeated comments guaranteeing a successful investment and guaranteeing certain returns;

c.   Deliberately concealing the investment commingling between Defendant Evdokimov's companies and Cryptonomics, and failing to disclose the same;

d.   Reneging on promises to return unprofitable investments in Cryptonomics back to investors;

e.   Prematurely ending Cryptonomics' operations without properly informing or refunding Plaintiffs' investments;

f.   Deliberately investing in financially unsound ICOs despite numerous reassurances that each investment would undergo a stringent vetting process; and

g.   Intentionally failing to comply with U.S. securities regulations in regard to registration.

102.   Defendants knew those statements were false at the time they were made, or knew that the information they were omitting was required to make the information they did disclose not materially misleading.  As demonstrated by their awareness of the DAO Report, and making public statements that misrepresented that report, Evdokimov knew that his ICO was an unregistered sale of securities.  And the facts surrounding his misrepresentations are such that it is easy to draw a strong inference of scienter.

103.   Had Plaintiffs known the truth about the Cryptonomics investment scheme, they would not have sent money (either fiat, Bitcoin, or any other cryptocurrency) to Cryptonomics.

104.   As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their investment in Cryptonomics.

# COUNT II

## VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT

### (Against Evdokimov)

105.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

106.   This Count is asserted against Defendant Evdokimov under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

107.   Defendant Evdokimov, by virtue of his office, stock ownership, agency, agreements or understandings, and specific acts was, at the time of the wrongs alleged herein, the controlling person within the meaning of Section 20(a) of the Exchange Act.  Defendant Evdokimov had the power and influence and exercised the same to cause the material misrepresentations and omissions in connection with the investment with Cryptonomics.

108.   Defendant Evdokimov possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of Cryptonomics, through the ownership of voting securities, by contract, subscription agreement, or otherwise.

109.   Defendant Evdokimov was a direct participant in making, and/or was made aware of the circumstances surrounding, the materially false and/or misleading representations and omissions regarding Cryptonomics' investment scheme.

110.   Defendant Evdokimov, founder of Cryptonomics, continuously touted his credentials as a high-experienced, cryptocurrency expert.  Evdokimov made repeated statements, videos, and presentations attesting to guaranteed profits if Plaintiffs invested in Cryptonomics.

111.   Evdokimov knew or should have known that Cryptonomics was required to seek proper registration though the SEC.

112.   As a direct and proximate result of Evdokimov's wrongful conduct, Plaintiffs suffered damages in connection with their investment in Cryptonomics.

## COUNT III

## VIOLATIONS OF SECTIONS 5 AND 12(a)(1) OF THE SECURITIES ACT

### (Against All Defendants)

113.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

114.   This Count is brought pursuant to Sections 5 and 12(a)(1) of the Securities Act, 15 U.S.C. §§ 77e and 77l(a)(1), against all Defendants.

115.   Federal securities laws require that companies disclose certain information through the registration with the SEC of the offer or sale of securities.  This information allows investors to make informed judgments about whether to purchase a company's securities.

116.   Defendants promoted, offered, and/or sold securities with their Portfolios and investment scheme.

117.   Defendants are issuers, underwriters, and/or necessary participants of/in the sales of cryptocurrency.

118.   No Defendant or other person filed with the SEC a registration statement regarding Cryptonomics' investment/sales of cryptocurrency.  No registration was in effect at the time Plaintiffs made their investments with Cryptonomics, and no exemption to the registration requirement was available.

119.   Defendants used the instrumentalities of interstate commerce in connection with their investment scheme.

120.   By engaging in the conduct described above, Cryptonomics offered and sold securities without a registration statement in effect and without a registration exemption.

121.   Investors who bought into Cryptonomics' investment scheme made an investment of money in a common enterprise with Cryptonomics and with each other, and reasonably would have been led to expect profits derived from the entrepreneurial and managerial efforts of Cryptonomics and its agents.  This is especially so given Defendants' numerous statements "guaranteeing success."

122.   Cryptonomics never filed any form indicating an exemption with respect to its investment scheme with the SEC.  However, this cryptocurrency investment scheme was not exempt from registration:  investors' funds, including Plaintiffs', were used for the offer and sale of cryptocurrency to the general public, and the fundraise was not limited to accredited investors.

123.   As a result of the conduct described above, Defendants violated Section 5(a) of the Securities Act, which states that unless a registration statement is in effect as to a security, it is unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

124.   Also as a result of the conduct described above, Defendants violated Section 5(c) of the Securities Act, which states that it is unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security.

125.   Section 12(a)(1) grants Plaintiffs a private right of action against any person who offers or sells a security in violation of Section 5, and states that such person, "shall be liable … to the person purchasing such security from him,

27

who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."

126.   Defendant Evdokimov, as the founder and promoter of Cryptonomics, constitutes as an "offer[or]" or "seller" under Section 12 of the Securities Act, and is thus liable for selling unregistered securities in connection with investments with Cryptonomics.

127.   Evdokimov and Cryptonomics profited handsomely from these investments.

128.   Defendants are still in control of investment funds and have continued to refuse to refund any of Plaintiffs' investments.

129.   As such, all Defendants have participated in the offer and sale of unregistered securities in violation of the Securities Act, and are liable to Plaintiffs jointly and severally for rescission and/or compensatory damages.

## COUNT IV

## VIOLATION OF SECTION 15 OF THE SECURITIES ACT
### (Against Evdokimov)

130.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

131.   This Count is asserted against Evdokimov under Section 15 of the Securities Act, 15 U.S.C. § 77o.

132.   Defendant Evdokimov, by virtue of his office, stock ownership, agency, agreements or understandings, and specific acts was, at the time of the wrongs alleged herein, a controlling person within the meaning of Section 15 of the Securities Act.  Defendant Evdokimov had the power and influence and exercised the same to cause the unlawful investment scheme with Cryptonomics.

133.   Defendant Evdokimov possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of Cryptonomics, through the ownership of voting securities, by contract, subscription agreement, or otherwise.

134.   Defendant Evdokimov has sufficient influence to have caused Cryptonomics to not submit a registration statement.

135.   Defendant Evdokimov, founder of Cryptonomics, continuously touted his credentials as a high-experienced, cryptocurrency expert.  Evdokimov knew or should have known that Cryptonomics was required to seek proper registration though the SEC.

136.   By virtue of the conduct alleged herein, Defendant Evdokimov is liable for the wrongful conduct complained of herein and is liable to Plaintiffs for rescission and/or damages suffered.

## COUNT V

## COMMON LAW FRAUD

### (Against all Defendants)

137.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

138.   This Count is asserted against all Defendants.

139.   Defendants authorized and/or made representations concerning the investment opportunity with Cryptonomics.

140.   The misrepresentations and omissions alleged herein include:

a.   Failure to disclose all the risks associated with Cryptonomics' business model, and indeed providing false comfort by making statements indicating that it would be a profitable investment scheme;

b.   Repeatedly making false statements regarding the profitability of investing with Cryptonomics Capital, including repeated comments guaranteeing a successful investment;

c.   Deliberately concealing the investment commingling between Defendant Evdokimov's companies and Cryptonomics, and failing to disclose the same;

d.   Reneging on promises to return unprofitable investments in Cryptonomics back to investors;

e.   Prematurely ending Cryptonomics operations without properly informing or refunding Plaintiffs' investments;

f.   Deliberately investing in financially unsound ICOs despite numerous reassurances that each investment would undergo a stringent vetting process; and

g.   Intentionally failing to comply with U.S. securities regulations in regard to registration.

141.   Defendants' representations and omissions were materially false and misleading when made.  These representations and omission were made intentionally or with reckless disregard for the truth.

142.   Defendants made these misrepresentations and omissions to Plaintiffs directly with knowledge that Plaintiffs would rely on them.

143.   Based up on their superior knowledge and expertise, their incomplete and misleading disclosures, and in light of the fact that Plaintiffs did not have access to material facts that were uniquely within Defendants' knowledge, Defendants had an affirmative duty to provide full, complete, and accurate disclosure of these material facts.

144.   Plaintiffs reasonably and justifiably relied to their detriment on Defendants' misrepresentations and omissions and on Defendants' affirmative duty to provide full, complete, and accurate disclosures to them.

30

COMPLAINT

145.   Defendants' misrepresentations and omissions induced Plaintiffs to invest with Cryptonomics, which they would not have done had Defendants been truthful.

146.   As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiffs have suffered damages.

147.   Because Defendants' conduct affected the public generally, and was gross and highly morally culpable, Plaintiffs also are entitled to punitive damages.

## CONCLUSION

**WHEREFORE,** Plaintiffs demand judgment against Defendants as follows:

A.   Declaring that Defendants are liable to Plaintiff under Sections 10(b) and/or 20(a) of the Exchange Act and/or Sections 5, 12(a)(1), and/or 15(a) of the Securities Act;

B.   Requiring an accounting of the funds and assets rightfully belonging to Plaintiffs;

C.   Ordering rescission of the investments made by Plaintiffs in the unregistered securities, and/or compensatory damages;

D.   Awarding punitive damages;

E.   Awarding Plaintiffs pre-judgment interest;

F.   Awarding Plaintiffs the costs of this action, including reasonable attorneys' fees and disbursements; and

G.   Granting such other and further relief as this Court may deem just and proper.

COMPLAINT

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

Dated:  Sept. 20, 2019

MARK BECK LAW, PC

By:   /s/ John Hanusz
      John Hanusz


MORRISON COHEN LLP

By:   /s/ Jason Gottlieb
      Jason Gottlieb (*pro hac vice* forthcoming)
      Modupeolu Adegoke (*pro hac vice* forthcoming)

Attorneys for Plaintiffs Vitaly Anaykin
and Konstantin Bondarev

32

COMPLAINT