HANUSZ LAW, PC
John Hanusz (SBN 277367)
Email: john@hanuszlaw.com
800 Wilshire Boulevard, Suite 1050
Los Angeles, California 90017
Telephone: (213) 204-4200

MORRISON COHEN LLP
Jason Gottlieb (*pro hac vice*)
Email: jgottlieb@morrisoncohen.com
Modupeolu Adegoke (*pro hac vice*)
Email: dadegoke@morrisoncohen.com
909 Third Avenue
New York, New York 10022

Telephone: (212) 735-8600
Facsimile: (212) 735-8708

Attorneys for Plaintiffs Vitaly Anaykin and Konstantin Bondarev

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VITALY ANAYKIN and KONSTANTIN BONDAREV, <br><br> Plaintiffs, <br><br> v. <br><br> NIKOLAY EVDOKIMOV, MARIA BATURA, and CRYPTONOMICS CAPITAL, <br><br> Defendants. | Case No. 19-CV-08165-DSF-AFM <br><br> **PLAINTIFFS' RENEWED MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANTS NIKOLAY EVDOKIMOV AND CRYPTONOMICS CAPITAL** |

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................... iii

I.  INTRODUCTION  ...................................................................1

II.  STATEMENT OF FACTS ........................................................3

    A.  Initial Coin Offerings................................................................3

    B.  Cryptonomics' Investment Portfolio Promised High
        Rates of Return ........................................................................3

    C.  The Defaulted Defendants Lured Plaintiffs with
        Misrepresentations Regarding the Investment Scheme and
        Effectiveness of Cryptonomics Capital ....................................5

    D.  Cryptonomics' Actions Fall Under Federal Securities Laws .....7

    E.  Evdokimov Had an Active Role in Cryptonomics' Actions ......8

    F.  The Defaulted Defendants Continue to Evade Their
        Legal Responsibilities ...............................................................9

III.  ARGUMENT...........................................................................10

    A.  Plaintiffs Have Met the Requirements for
        Default Judgment......................................................................12

    B.  Default Judgment is Warranted Under the *Eitel* Factors..........12

        1.  Plaintiffs Would Be Prejudiced Without Entry
            of Default Judgment.....................................................12

        2.  Plaintiffs Have Demonstrated the Merits of
            Their Claims ................................................................13

        3.  The Damages Sought are Proportionate
            to the Defaulted Defendants' Conduct .........................18

i

4.     There is No Possibility of Disputed Material Facts .......19

5.     The Defaulted Defendants' Default Was Not Due to
       Excusable Neglect ........................................................19

6.     The Policy Favoring Decisions on
       the Merits Does Not Preclude Default Judgment
       Against the Defaulted Defendants.................................20

C.     Plaintiffs Are Entitled to the Damages Sought ........................20

IV.    CONCLUSION .................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## FEDERAL CASES

*Acceptance Indem. Ins. Co. v. Bray*,
No. 18-CV-2996-RGK-FFM, 2018 WL 6017017 (C.D. Cal. July 26, 2018)..........................................................................................13

*Adriana Int'l Corp. v. Thoeren*,
913 F.2d 1406 (9th Cir. 1990)..........................................................10

*Air Separation, Inc. v. Underwriters at Lloyd's of London*,
45 F.3d 288 (9th Cir. 1994)..............................................................24

*Aldabe v. Aldabe*,
616 F.2d 1089 (9th Cir. 1980)..........................................................11

*Arizona v. Asarco LLC*,
773 F.3d 1050 (9th Cir. 2014)..........................................................24

*Board of Trs. of the Sheet Metal Workers' Pension Plan of S. Cal. v. Westway Constr., Inc.*,
No. 09-CV-7023 GAF-FMO, 2010 WL 11596465 (C.D. Cal. Feb. 26, 2010)..........................................................................................11

*Benny v. Pipes*,
799 F.2d 489 (9th Cir. 1986)............................................................11

*DirecTV, Inc. v. Hoa Huynh*,
503 F.3d 847 (9th Cir. 2007)............................................................10

*Eitel v. McCool*,
782 F.2d 1470 (9th Cir. 1986)....................................................*passim*

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976)..........................................................................14

*Geddes v. United Fin. Group*,
559 F.2d 557 (9th Cir. 1977)............................................................13

*Guadarrama v. Chadorbaff*,
No. 17-CV-605-DOC-JDE, 2018 WL 5816191 (C.D. Cal. Apr. 30, 2018)..........................................................................................23

RENEWED MOTION FOR DEFAULT JUDGMENT

*Henry v. Sneiders*,
   490 F.2d 315 (9th Cir. 1974).................................................................21

*Hollinger v. Titan Capital Corp.*,
   914 F.2d 1564 (9th Cir. 1990)........................................................13, 14

*Jianhua Jin v. Tang*,
   No. 16-CV-1884-GW-AJW, 2018 WL 6177258 (C.D. Cal. Feb.
   22, 2018)..............................................................................................11

*Kaffaga v. Estate of Steinbeck*,
   938 F.3d 1015-16 (9th Cir. 2019).......................................................23

*Kerr Corp. v. Tri Dental, Inc.*,
   No. 12-CV-891-DOC-CW, 2013 WL 990532 (C.D. Cal. Mar.
   11, 2013)..............................................................................................13

*Landstar Ranger, Inc. v. Parth Enterprises, Inc.*,
   725 F.Supp.2d 916 (C.D. Cal. 2010)...............................13, 19, 25

*Merkamerica Inc. v. Glover*,
   No. 19-CV-6111-PSG-GJS, 2019 WL 8989833 (C.D. Cal. Dec.
   3, 2019)................................................................................................14

*Mihara v. Dean Witter & Co.*,
   619 F2d 814 (9th Cir. 1980)................................................................22

*PepsiCo, Inc. v. Cal. Sec. Cans*,
   238 F. Supp. 2d 1172 (C.D. Cal. 2002) ...........................12, 13, 18, 20

*PepsiCo, Inc. v. Triunfo-Mex, Inc.*,
   189 F.R.D. 431 (C.D. Cal. 1999) .......................................................11

*Philip Morris USA v. Castworld Products, Inc.*,
   219 F.R.D. 494 (C.D. Cal. 2003) .......................................................12

*PR Diamonds v. Chandler*,
   364 F.3d 671 (6th Cir. 2004)..............................................................14

*Prof'l Seminar Consultants, Inc. v. Sino Am. Tech. Exch. Council,
   Inc.*,
   727 F.2d 1470 (9th Cir. 1984)............................................................23

*San Francisco Residence Club, Inc. v. Amado*,
   773 F. Supp. 2d 822 (N.D. Cal. 2011)................................................17

iv

RENEWED MOTION FOR DEFAULT JUDGMENT

*SEC v. CMKM Diamonds*,
   729 F.3d 1248 (9th Cir. 2013) ........................................................17

*SEC v. Dain Rauscher, Inc.*,
   254 F.3d 852 (9th Cir. 2001) ..........................................................14

*SEC v. Glenn W. Turner Enterprises, Inc.*,
   474 F.2d 476 (9th Cir. 1973) ..........................................................14

*SEC v. Interlink Data Network*,
   No. 93-CV-3073-R, 1993 WL 603274 (C.D. Cal. Nov. 15, 1993) ...............17

*SEC v. Mogler*,
   No. 19-CV-1814-PHX-SPL, 2020 WL 1065865 (D. Ariz. Mar. 5,
   2020) ......................................................................................17

*SEC v. Murphy*,
   626 F.2d 633 (9th Cir. 1980) ..............................................14, 16, 17

*SEC v. Pacheco*,
   No. 19-CV-958-MWF-AFM, 2020 WL 5100849 (C.D. Cal. Aug.
   6, 2020) ...................................................................................14

*SEC v. Rana Research, Inc.*,
   8 F.3d 1358 (9th Cir. 1993) ............................................................14

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ..........................................................3, 4, 15

*SEC v. Wallace*,
   No. 16-CV-1788-AG-FFM, 2017 WL 8230026 (C.D. Cal. May
   8, 2017) ...................................................................................17

*SEC v. Wayland*,
   No. 17-CV-1156-AG-DFM, 2019 WL 2620669 (C.D. Cal. Apr.
   8, 2019) ...................................................................................17

*TeleVideo Sys., Inc. v. Heidenthal*,
   826 F.2d 915 (9th Cir. 1987) ........................................13, 19, 20

*Turocy v. El Pollo Loco Holdings, Inc.*,
   No. 15-CV 1343-DOC-KES, 2018 WL 3343493 (C.D. Cal. July
   3, 2018) ...................................................................................14

*Vess v. Ciba-Giegy Corp.*,
   317 F.3d 1097 (9th Cir. 2003) ........................................................18

v

*Vogel v. Rite Aid Corp.*,
  992 F. Supp. 2d 998 (C.D. Cal. 2014) ........................................................20

*Xerox Corp. v. Am. Mail Ctrs., Inc.*,
  No. 16-CV-42-DOC-KES, 2016 WL 10835982 (C.D. Cal. July
  20, 2016)........................................................................................................19

*Xueying Zhai v. Hongjie Zhang*,
  No. 17-CV-4946-SJO-RAO, 2018 WL 6137609 (C.D. Cal. Nov.
  5, 2018)..........................................................................................................18

**STATE CASES**

*Alliance Mortg. Co. v. Rothwell*,
  10 Cal. 4th 1226 (1995) ...............................................................................22

**STATUTES & RULES**

17 C.F.R. § 240.10b-5............................................................... 14, 15, 16, 18

28 U.S.C. § 1961..........................................................................................24

Cal. Civ. Code § 3287...................................................................................24

Cal. Civ. Code § 3288...................................................................................24

Cal. Civ. Code § 3294...................................................................................23

Cal. Civ. Code § 3333.............................................................................21, 22

Exchange Act Section 10(b)...................................................................*passim*

Exchange Act Section 15(a).................................................................2, 13, 17

Exchange Act Section 20(a)...........................................................2, 13, 14, 16

Fed. R. Civ. P. 54(c) ...........................................................................6, 12, 21

Fed. R. Civ. P. 55..............................................................................2, 10, 11

Local Rule 55-1.............................................................................................12

Local Rule 55-2.............................................................................................11

Securities Act of 1933 Section 5..........................................................2, 8, 17

Securities Act of 1933 Section 12.............................................................2, 16

vi

Securities Act of 1933 Section 15 ................................................................2, 17

Sevicemembers' Civil Relief Act of 1940 (50 U.S.C. §§ 3901-4043) ...............12

RENEWED MOTION FOR DEFAULT JUDGMENT

## I. **INTRODUCTION**

Plaintiffs Vitaly Anaykin ("Anaykin") and Konstantin Bondarev ("Bondarev," and collectively, "Plaintiffs") hereby move for entry of default judgment against defendants Nikolay Evdokimov ("Evdokimov") and Cryptonomics Capital ("Cryptonomics" and with Evdokimov, "Defaulted Defendants") whose defaults for failure to respond to the Complaint were entered by the clerk on April 28, 2020. *See* Dkt. No. 40. Because the Defaulted Defendants have failed to answer or otherwise respond to the First Amended Complaint ("Amended Complaint"), and since the evidence presented by Plaintiffs unequivocally establishes the appropriate monetary relief, default judgment is warranted.

Earlier in this litigation, Plaintiffs moved for default judgment against the Defaulted Defendants. *See* Dkt. No. 41. On June 12, 2020, this Court denied Plaintiffs' motion for default judgment without prejudice, because the action was pending against former defendant Maria Batura, who had filed an answer. *See* Dkt. No. 42. However, on May 26, 2021, Batura was dismissed voluntarily from this litigation. *See* Dkt. No 83. As Batura is no longer a defendant in this action, and there is no remaining danger of incongruent results, inconsistent judgments, or a default judgment implicating "the merits of the claims against non-defaulted Defendant Batura" (*see* Dkt. No. 42), Plaintiffs now renew their application for an entry of default judgment against Evdokimov and Cryptonomics.

Evdokimov, through Cryptonomics, orchestrated a concerted effort to advertise to investors with no prior knowledge of cryptocurrency, that they would be able to invest in Initial Coin Offerings ("ICOs" or "ICO projects") and blockchain technology. The Defaulted Defendants assured potential investors that through the use of the Defaulted Defendants' experts and alleged unique portfolios, investors were guaranteed returns on their investments. Cryptonomics' website, which is no longer operable, advertised that investors would not be

making high risk cryptocurrency investments because Cryptonomics' formula ensured a guaranteed successful investment.  In the Cryptonomics model, investors would invest in either cash or Bitcoin.   Cryptonomics would act as the intermediary, choosing which ICO projects to invest in, selling the resulting token, and divesting a portion of the original proceeds back to the original investor.

The Defaulted Defendants were running a scam.  Using false promises of high favorable returns, the Defaulted Defendants knowingly misled Plaintiffs to purchase unregistered securities (cryptocurrency) that, unbeknownst to Plaintiffs, were not financially sound.  The Defaulted Defendants did not register or associate with a broker-dealer, and instead acted as unregistered securities brokers; soliciting and attracting investors to invest in unregistered security offerings in exchange for transaction-based compensation.   The Defaulted Defendants' representations induced Plaintiffs to invest with Cryptonomics, but Plaintiffs never saw any returns on their investments.  *See* Declaration of Vitaly Anaykin ("Anaykin Decl.") ¶¶ 12-15; Declaration of Konstantin Bondarev ("Bondarev Decl.") ¶ 13, both filed concurrently herewith.   In addition to knowingly misleading Plaintiffs, the Defaulted Defendants violated securities laws' offering registration requirements and broker-dealer registration requirements by not registering with the United States Securities and Exchange Commission ("SEC"). Despite the magnitude of the Defaulted Defendants' misdeeds, the Defaulted Defendants have refused to refund any of Plaintiffs' investments.

Plaintiffs now renew their application under Rule 55(b)(2) for entry of default judgment against the Defaulted Defendants, stating that the Defaulted Defendants are liable to Plaintiffs under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C § 78j and 15 U.S.C § 78t, respectively) and Sections 5, 12(a)(1), and 15(a) of the Securities Act (15 U.S.C. § 77e, 15 U.S.C. § 77l and 15 U.S.C. § 77o, respectively); an order for an accounting of the funds and assets rightfully belonging to Plaintiffs; an order of the rescission of Plaintiffs' investments in the

RENEWED MOTION FOR DEFAULT JUDGMENT

unregistered securities; and damages in the amount of $8,717,497.45, prejudgment interest at the California seven percent statutory rate of $1,706,119.20 through June 9, 2021, and accruing at $1,671.85 per day thereafter through the date of the judgment, and punitive damages of $8,717,497.45, an amount equal to the compensatory damages.

## II.   STATEMENT OF FACTS

### A. Initial Coin Offerings

In an initial coin offering ("ICO"), a capital raising event, an entity offers investors a unique "coin" or "token" in exchange for consideration. Dkt. No. 22 ("Am. Compl.") at ¶ 27. The entity will subsequently distribute the token, entitling the token holder to certain rights. *Id.* ¶ 28.

These tokens may be securities. On July 25, 2017, the SEC issued a landmark report concluding that the tokens of a company called "The DAO" were securities that should have been registered with the SEC. *See* Exchange Act Release No. 81207 (July 25, 2017) (the "DAO Report"); Am. Compl. ¶ 30. That report "[p]ut the digital asset industry on notice that many digital assets … are securities under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and subject to the federal securities laws, including registration requirements." *DAO Report.*

On August 28, 2017, the SEC issued an investor alert about public companies making ICO-related claims. Am. Compl. ¶ 32. The SEC also issued trading suspensions against certain issuers for making claims regarding their ICOs. *Id.* The SEC's repeated statements put Evdokimov and other issuing entities on notice that token offerings such as ICOs may be considered securities offerings, subject to the federal securities laws; and that funds, such as Cryptonomics, may be considered a broker-dealer operating on an unregistered basis. *Id.* ¶ 34.

### B. Cryptonomics' Investment Portfolio Promised High Rates of Return

Cryptonomics Capital, a Swiss-based company, was founded and operated by Defendant Evdokimov out of offices in San Francisco. Am. Compl. ¶ 35.

Cryptonomics, with its alleged experts, would act as an intermediary, in which investors would invest in either cash or Bitcoin with the company.  *Id.* ¶ 41. Cryptonomics would in turn choose which ICO projects to invest, sell the resulting token, and divest a portion of the profits back to the original investor.  *Id.*

Cryptonomics' business model bore all the characteristics of an investment contract under the *Howey* test: investors invested money in a common enterprise, and were led to expect profits solely from Cryptonomics' efforts.  *Id.* ¶ 43.

Between October 2017 and March 2018, the Defaulted Defendants created investment portfolios, Portfolio 1 and 2, which allowed investors to choose between pre-selected ICO projects.  Am. Compl. ¶ 54.  The Defaulted Defendants promised that a minimum investment with Portfolio 1 would yield a 50% return within two months.  *Id.* ¶ 55.  Evdokimov further claimed that "we return to our investors in the first portfolio, for example on investing 100 bitcoin, we return 150 Bitcoin in a well-regulated time frame, two months, that is, so for a cycle of two months from the moment of investment for each invested Bitcoin, we return one and a half ... Naturally, 50% in two months is 1113% per annum, and this is essentially the volume of risk-free investments, since the sale of these tokens does not depend on any external factors."  *Id.* ¶ 56.

Similar to Portfolio 1, the Defaulted Defendants claimed that a minimum investment in Portfolio 2 would lead to a 700-plus percent return on investment within 4-8 months.  Am. Compl. ¶ 58.  From videos posted on Cryptonomics' YouTube channel, the Defaulted Defendants repeatedly assured investors that an investment with Cryptonomics would lead to profitable returns.  *Id.* ¶¶ 55-62.  This was due in part to the Defaulted Defendants' team of experts and "specialists" who were allegedly evaluating each token before it was entered into a Portfolio. *Id.* ¶ 37.

**C. The Defaulted Defendants Lured Plaintiffs with Misrepresentations Regarding the Investment Scheme and Effectiveness of Cryptonomics Capital**

Per Cryptonomics now-defunct website, new investors would have been able to "[e]arn on investments in profitable projects without knowledge in the field of ICO and blockchain technologies." Am. Compl. ¶ 40. According to the Defaulted Defendants, Cryptonomics would thoroughly analyze ICO projects and provide investors insight to buy tokens at a maximum discount and sell at a profit. *Id.* ¶ 40. It was this model, according to a September 2017 Cryptonomics presentation, that attracted more than "38,000 investors from 95 countries" and made Cryptonomics a premier expert on the crypto investment market. *Id.* ¶ 42. From these investments, the Defaulted Defendants repeatedly claimed that through Cryptonomics, investors could make safe cryptocurrency-related investments that could lead to over a 700% profit. *Id.* ¶¶ 4, 56, 58, 85.

The Defaulted Defendants also guaranteed that investors could receive profits through Cryptonomics' compensation structure and receive a one-time 4% commission for personally recruiting affiliates. *Id.* ¶ 63. From there, an investor-recruit would continue to receive commissions based on the recruited affiliates also recruiting new investors. *Id.* Once the affiliates in the first level started recruiting new affiliates, the new members were placed on the second level and the structure continues growing. *Id.*

***Plaintiffs' Investments with Cryptonomics***. These representations and guarantees of profit caused Plaintiffs to invest with Cryptonomics. *Id.* ¶ 82; Anaykin Decl. ¶¶ 10-12; Bondarev Decl. ¶¶ 7-8, 10, 12. From December 11, 2017 to January 13, 2018,[1] Anaykin made a series of deposits (in Bitcoin), with Cryptonomics, totaling at the time, $678,260.36. *Id.* ¶ 86; Anaykin Decl. ¶¶ 4-7, Exs. 1, 2. On August 27, 2018, Anaykin made additional deposits with

---

[1] *See* Anaykin Decl. Ex. 1. The Amended Complaint erroneously stated that the date of this investment was January 15, 2018. Am. Compl. ¶ 86. Per Anaykin's screenshots, the correct date is January 13, 2018. *See* Anaykin Decl. Ex. 1.

RENEWED MOTION FOR DEFAULT JUDGMENT

Cryptonomics.  Anaykin Decl. ¶¶ 4-7, Exs. 1, 2.  These deposits, in Bitcoin, were (at the time) worth approximately $300,603.63[2].  *Id*.; Am. Compl. ¶ 87.  Anaykin's total investment sum was thus valued at $978,863.99.  Anaykin Decl.  ¶ 8.  Anaykin also participated in Cryptonomics' bonus referral system, earning 2.631 Bitcoin. *Id.* ¶ 89; Anaykin Decl. ¶ 9.

Bondarev similarly invested in Cryptonomics (in Bitcoin), worth approximately $121,600.00. *Id.* ¶ 92; Bondarev Decl. ¶ 5.

***The Defaulted Defendants' Business Model and Claims for Profitable Returns Were False***.  Cryptonomics' actual business model and promises of profit were contrary to reality.  *Id.* ¶ 66.  The Defaulted Defendants never had "[o]ver 80 specialists evaluate the ICOs" but instead, as per its own website, only had at most five people employed at the company.  *Id.* ¶ 67.  Prior to the shutting down of Cryptonomics' website, there were only two employees advertised as working at the company.  *Id.* ¶ 37.

Even with no actual experts, the Defaulted Defendants continued to assert in videos and presentations that their investments would "guarantee success." *Id.* ¶ 74.   In the numerous videos posted both on Cryptonomics' website and YouTube channel, the Defaulted Defendants promised a high rate of return and Evdokimov promised that if an investor failed to see a return on his investment, he would personally take a loan to repay the investment.  *Id.* ¶ 75; Anaykin Decl. ¶ 12; Bondarev Decl. ¶ 10.  Plaintiffs repeatedly asked for such a refund but Defendants failed to respond.  Am. Compl. ¶ 67; Anaykin Decl. ¶16; Bondarev Decl. ¶ 14. Additionally, from December 30, 2017 to July 30, 2018, Cryptonomics proclaimed each month that investors were receiving profits from their

---

[2]    *See* Anaykin Decl., ¶ 5.  In reviewing his investments once again for the purposes of his affidavit, Anaykin realized that the investments he originally believed occurred on June 17, 2018, actually occurred on August 27, 2018 for a lesser Bitcoin value. *See id.*  Because the value of Bitcoin was slightly higher at the time of his August 27, 2018 investment, Anaykin's investments with the Defaulted Defendants was actually $300,603.63 (in U.S. dollars) as opposed to $270,598.71 alleged in the Amended Complaint. *See id.*  However, to comply with Fed. R. Civ. P. 54(c), Anaykin is not claiming the extra $30,000 on losses for this default judgment, and is willing to forego those losses in order to ensure he is seeking relief in an amount identical to the Amended Complaint.

RENEWED MOTION FOR DEFAULT JUDGMENT

investments.  *Id.* ¶ 76; Anaykin Decl. ¶ 15.  Plaintiffs did not receive any profits from their investments with the Defaulted Defendants.  Am. Compl. ¶ 76; Anaykin Decl. ¶ 15; Bondarev Decl. ¶ 13.

Based upon the Defaulted Defendants' statements, both Plaintiffs expected a return ranging from 50% to 700%. Am. Compl. ¶ 90, 93; Anaykin Decl. ¶ 11; Bondarev Decl. ¶ 8.   Instead, and contrary to the Defaulted Defendants' repeated advertisements and promises of profit, Plaintiffs never received any returns from their chosen Portfolios, nor did Evdokimov ever offer to refund their investments. Am. Compl. ¶¶ 91, 94; Anaykin Decl. ¶ 16; Bondarev Decl. ¶ 14.

The Portfolios that the Defaulted Defendants had claimed contained carefully-chosen tokens were not legitimate.  Am. Compl. ¶ 68.  One such ICO project was Decenturion, whose token, "DCNT," was unveiled in May 2018. *Id.* ¶ 68.  Decenturion, which no longer has a functioning website, was established by Evdokimov, who had a stake in the company.  *Id.* ¶ 68.  Decenturion's cryptocurrency was also a security that had not been registered, nor did it qualify for any exemption.  *Id.* ¶ 69.  Cryptonomics misrepresented that the values of Decenturion for 2018 would skyrocket.  *Id.* ¶ 70.  This never happened; Decenturion's value collapsed in less than three months.  *Id.* ¶ 72.  Decenturion is now defunct with a current value of less than $0.05.  *Id.*

Despite the Defaulted Defendants' repeated assurances guaranteeing profitability and low risk investments, Cryptonomics instead chose to invest Plaintiffs' funds into non-established ICOs, run by Evdokimov, which had little support from the cryptocurrency community.  *Id.* ¶ 73.

**D. Cryptonomics' Actions Fall Under Federal Securities Laws**

Plaintiffs invested in Cryptonomics and were led to expect profits from Cryptonomics' alleged efforts.  Am. Compl. ¶ 43. The Defaulted Defendants, acting as (unregistered) broker-dealers, chose which ICO projects to invest and which tokens to sell.  *Id.* ¶¶ 41, 44.  Cryptonomics, in choosing specific

7

investments, acted as an investment adviser and broker-dealer. *Id.* ¶ 44. The Defaulted Defendants conducted their operations out of their office in the United States, where they were required to comply with all applicable federal securities Laws. *Id.* ¶ 96. Under Section 5 of the Securities Act, all issuers must register nonexempt securities with the SEC. *Id.* ¶ 95. Unless a registration statement is in effect as to a security, it is unlawful for any person, directly or indirectly, to (1) make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or to (2) carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale. *Id.* ¶ 95.

The Defaulted Defendants were thus required to register their activities with the SEC. Am. Compl. ¶ 11. Not only did the Defaulted Defendants fail to take any steps to register with the SEC, they failed to register with any relevant regulator. *Id.* The Defaulted Defendants knew or reasonably should have known registration was required, as the SEC had previously stated that ICOs may be issuances of securities that must comply with federal securities laws; and the SEC and the Commodity Futures Trading Commission had filed numerous lawsuits against individuals and companies for the unlawful issuance of cryptocurrencies that are securities or commodities. *Id.* Evdokimov was well aware of these requirements, because at the time of the Cryptonomics offering, he publicly discussed the treatment of cryptocurrencies as securities, including in an interview with Reuters and in communications with potential investors. *Id.* ¶ 31.

**E. Evdokimov Had an Active Role in Cryptonomics' Actions**

Though Evdokimov previously described himself as the "Strategic Advisor" of Cryptonomics, he was repeatedly cited as the founder and manager of Cryptonomics' operations. *Id.* ¶ 36. Evdokimov was active in soliciting clients for Cryptonomics, conducting interviews on behalf of the company, and making

appearances at blockchain conferences.  Am. Compl. ¶ 1.  Evdokimov personally disseminated information about Cryptonomics' activities and repeatedly assured prospective investors of Cryptonomics' profitability.  *Id*. ¶ 14.  Evdokimov, as the founder of Cryptonomics, continuously touted his credentials as a highly experienced, cryptocurrency expert and made repeated statements, videos, and presentations attesting to guaranteed profits if Plaintiffs invested in Cryptonomics. *Id*.  ¶ 117.   These statements included: claiming returns on Cryptonomics' Portfolios would be as high as 6000% per year (*id*. ¶ 61), falsely reporting that investors were seeing returns on their investments *(id.* ¶ 76), and stating that he would personally refund any investments that were not profitable (*id*. ¶ 79).

**F. The Defaulted Defendants Continue to Evade Their Legal Responsibilities**

On September 18, 2019, the SEC instituted an action against Evdokimov and his company, ICOBox, for a similar unregistered securities offering, "as well as the unregistered broker activities related to securities offered by ICOBox's clients ... [that exposed] thousands of investors to risky investments without providing the necessary information and protections required by the federal securities laws."  *See* Complaint, *SEC v. ICOBox and Nikolay Evdokimov*, No. 19-CV-8099-DSF (C.D. Cal, filed Sept. 18, 2019) ("*SEC v. ICOBox*"); Am. Compl. ¶ 12.   On March 5, 2020, this Court granted the SEC's motion for default judgment.  *SEC v. ICOBox*, Dkt. No. 16.

Plaintiffs filed this action on September 20, 2019.  *See* Dkt. No. 1.  The Complaint alleged that Evdokimov and his company Cryptonomics fraudulently misled Plaintiffs into investing money in a cryptocurrency scheme.  On December 9, 2019, Plaintiffs filed their First Amended Complaint, adding Batura, Evdokimov's wife and co-conspirator in the scheme.  *See* Dkt. No. 22.  Batura appeared in this case, and filed her Answer on February 18, 2020.  *See* Dkt. No. 28.  On February 28, 2020, this Court permitted Plaintiffs to serve Evdokimov and

Cryptonomics by publication in the *Los Angeles Times* and through their respective Facebook, LinkedIn, Twitter, Instagram, and Telegram sites.  Dkt. No. 32.   On March 4, 2020, Plaintiffs' counsel also e-mailed the summons to Evdokimov's last known e-mail address.  *See id.* Plaintiffs also completed service by publication on Defendants on March 25, 2020.  *See id.*  Evdokimov and Cryptonomics did not respond to any of Plaintiffs' aforementioned attempts for service of process and On April 27, 2020, Plaintiffs requested that the Clerk enter defaults under Fed. R. Civ. P. 55(a).  *See* Dkt. No. 36. The Clerk entered defaults on April 28, 2020.  *See* Dkt. No. 40.

On May 20, 2020, Plaintiffs moved for default judgment against the Defaulted Defendants. *See* Dkt. No. 41. On June 12, 2020, this Court denied Plaintiffs' motion for default judgment, without prejudice, because the action against Batura was still pending and a default judgment could affect Plaintiffs' claims against Batura. *See* Dkt. No. 42.   On May 26, 2021, Plaintiffs and Batura filed a Stipulation of Voluntary Dismissal, dismissing Plaintiffs' claims against Batura. *See* Dkt. No 83.  Batura is no longer a defendant in this action.[3]  Plaintiffs now renew their application for an entry of default judgment against Evdokimov and Cryptonomics.

## III.   <u>ARGUMENT</u>

Under Rule 55(b)(2) of the Federal Rules of Civil Procedure, the Court may enter a default judgment when a party has failed to plead or otherwise defend a case.  The Court does not have to make detailed findings of fact in the event of default.  *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1414 (9th Cir. 1990). Instead, on entry of a default, well-pled allegations in the complaint regarding liability are generally deemed to be admitted. *DirecTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 851 (9th Cir. 2007).  An entry of default judgment is further justified

---

[3] While Batura was voluntarily dismissed from the action, Evdokimov and Cryptonomics were not dismissed and remain defendants.

RENEWED MOTION FOR DEFAULT JUDGMENT

when a party has failed to timely respond to a properly-served complaint. *Benny v. Pipes*, 799 F.2d 489, 495 (9th Cir. 1986). Lastly, the entry of a default judgment is left to the Court's sound discretion. *PepsiCo, Inc. v. Triunfo-Mex, Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999), citing *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

The Court considers several factors "in exercising discretion as to the entry of a default judgment includ[ing]: (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). The moving party may submit declarations and affidavits in support of the default judgment request. *See* Local Rule 55-2; *see also Board of Trs. of the Sheet Metal Workers' Pension Plan of S. Cal. v. Westway Constr., Inc.*, No. 09-CV-7023 GAF-FMO, 2010 WL 11596465, at *1 (C.D. Cal. Feb. 26, 2010) ("Along with the complaint, the court may look to affidavits and declarations to determine whether default judgment is appropriate."). "In applying this discretionary standard, default judgments are more often granted than denied." *PepsiCo*, 189 F.R.D. at 432.

Where, as here, one party has not defaulted in the action, courts may enter a final judgment as to the defaulting defendants. *See* Fed. R. Civ. P. 55; *see also Jianhua Jin v. Tang*, No. 16-CV-1884-GW-AJW, 2018 WL 6177258, at *1 (C.D. Cal. Feb. 22, 2018) (granting renewed motion for default judgment after court initially held default judgment was premature given the allegations of joint liability against non-defaulting party). An entry of default judgment against the Defaulted Defendants is appropriate here where Plaintiffs' claims against the only non-defaulted party, Batura, have been resolved and settled and Batura has been voluntarily dismissed from the action. Final judgment against the Defaulted

1 Defendants would expedite the final resolution of this case and would not lead to

2 incongruous results, inconsistent judgments, or detrimentally affect Batura, who

3 is no longer a defendant in this action.

4 **A. Plaintiffs Have Met the Requirements for Default Judgment**

5 Plaintiffs have complied with Rule 55(a) of the Federal Rules of Civil

6 Procedure and Local Rule 55-1.   Plaintiffs have: (1) completed service on

7 Defaulted Defendants Evdokimov and Cryptonomics with service of the Summons

8 and First Amended Complaint (Dkt. No. 32); (2) caused the clerk to enter defaults

9 against Evdokimov and Cryptonomics for their failure to answer (Dkt. No. 40);

10 (3) demonstrated that neither Evdokimov nor Cryptonomics are minors or

11 incompetent; and (4) demonstrated that Evdokimov and Cryptonomics are not in

12 the military or otherwise exempt under the Sevicemembers' Civil Relief Act of

13 1940 (50 U.S.C. §§ 3901-4043).   *See* Gottlieb Decl. ¶¶ 9-13.

14 Notice to Evdokimov and Cryptonomics of this renewed application for

15 default judgment motion and the relief requested are not required under Rule

16 55(b)(2) or Local Rule 55-1 because they have not appeared in this action in any

17 capacity.   Additionally, because Plaintiffs did not request relief that exceeds that

18 prayed for in the First Amended Complaint, the application for default judgment

19 complies with Rule 54(c).

20 **B. Default Judgment is Warranted Under the *Eitel* Factors**

21 **1. Plaintiffs Would Be Prejudiced Without Entry of Default**
22 **Judgment**

23 The possibility of prejudice exists where "[i]f Plaintiffs' motion for default

24 judgment is not granted, Plaintiffs will likely be without other recourse for

25 recovery." *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal.

26 2002); *see also Philip Morris USA v. Castworld Products, Inc.*, 219 F.R.D. 494,

27 499 (C.D. Cal. 2003) ("Plaintiff would suffer prejudice if the default judgment is

28 not entered because Plaintiff would be without other recourse for recovery.").

Here, Plaintiffs seek to enforce their remedies for the Defaulted Defendants' fraud and registration violations.  Absent a default judgment, Plaintiffs would be without other recourse for relief because Evdokimov and Cryptonomics have not appeared in this case since its inception.  *See Landstar Ranger, Inc. v. Parth Enterprises, Inc.*, 725 F.Supp.2d 916, 924 (C.D. Cal. 2010) (default judgment granted due to lack of other remedy). The possibility of prejudice is enhanced by the fact that Defendants have a judgment against them in another action (*SEC v. ICOBox*) where they have also failed to make an appearance.  *Kerr Corp. v. Tri Dental, Inc.*, No. 12-CV-891-DOC-CW, 2013 WL 990532, at *3 (C.D. Cal. Mar. 11, 2013) ("Defendants' past misconduct and current failure to litigate this case indicate that it is highly unlikely to correct past misbehavior or otherwise compensate Plaintiffs without a default judgment by the Court.")

## 2.  Plaintiffs Have Demonstrated the Merits of Their Claims

The second and third *Eitel* factors are often analyzed together. *PepsiCo*, 238 F. Supp. 2d at 1175.  "The Ninth Circuit has suggested that these two factors require that a plaintiff state a claim on which the plaintiff may recover." (internal citations and quotation marks omitted).  For the purpose of default, all well-pleaded allegations in the complaint relating to liability are assumed to be true. *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987)*; see also Acceptance Indem. Ins. Co. v. Bray*, No. 18-CV-2996-RGK-FFM, 2018 WL 6017017, at *2 (C.D. Cal. July 26, 2018)*.  Additionally, a defendant's liability is conclusively established and all factual allegations of the complaint, except those relating to damages, are assumed to be true. *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977).

Here, the Plaintiffs' well-pled allegations establish that Evdokimov and Cryptonomics violated Sections 10(b) and 20(a) of the Exchange Act and Sections 5, 12(a)(1), and 15(a) of the Securities Act.  Plaintiffs' have an implied private right of action under Section 10(b).  *See, e.g.*, *Hollinger v. Titan Capital Corp.*,

13

RENEWED MOTION FOR DEFAULT JUDGMENT

914 F.2d 1564, 1581 n.5 (9th Cir. 1990), citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196 (1976).  Moreover, "tokens" and investment contracts, as the one seen here in this action, are considered securities, governed by federal securities laws. *SEC v. Glenn W. Turner Enterprises, Inc*., 474 F.2d 476, 482 (9th Cir. 1973); *SEC v. Murphy*, 626 F.2d 633, 640 (9th Cir. 1980) ("An investment contract is a security.") (citations omitted); *Merkamerica Inc. v. Glover*, No. 19-CV-6111-PSG-GJS, 2019 WL 8989833 (C.D. Cal. Dec. 3, 2019) (applying federal securities laws to cryptocurrency); *SEC v. Pacheco*, No. 19-CV-958-MWF-AFM, 2020 WL 5100849, at *1 (C.D. Cal. Aug. 6, 2020) (same).

***Sections 10(b) and 20 violations.***  Section 10(b) and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5) prohibit fraud in connection with the purchase or sale of any security.  *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855 n.2 (9th Cir. 2001). Section 10(b) and Rule 10b-5 both "forbid (1) making a material misstatement or omission or employing a deceptive device or fraudulent scheme (2) in connection with the offer or sale of a security (3) by means of interstate commerce." *Id.* at 856.  Although Section 10(b) and Rule 10b-5 of the Exchange Act require that the defendants acted with scienter, the requisite state of mind may be established by a showing of recklessness. *Hollinger*, 914 F.2d at 1568-69.  "[A] reckless omission of material facts upon which the plaintiff put justifiable reliance in connection with a sale or purchase of securities is actionable under Section 10(b).  *Id.* at 1569. "Fraud touching the intrinsic value of securities and the means of accomplishing the purchase of securities is sufficiently connected with securities transactions to bring the fraud within section 10(b)." *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993).  Similarly, Section 20(a) (15 U.S.C § 78t; control person liability for securities fraud) imposes legal responsibility on a controlling person for Rule 10b-5 violations, and requires a predicate violation of the securities laws and regulations, such as a violation of Section 10(b)). *See PR Diamonds v. Chandler*, 364 F.3d 671, 696-97 (6th Cir. 2004); *Turocy v. El Pollo Loco Holdings,*

*Inc.*, No. 15-CV 1343-DOC-KES, 2018 WL 3343493, at *3 (C.D. Cal. July 3, 2018).

Defaulted Defendants Evdokimov and Cryptonomics violated Section 10(b) and Rule 10b-5 by selling securities based upon material misrepresentations and omissions regarding the nature and safety of the investments and by engaging in a fraudulent scheme. These misrepresentations and omissions include: (i) failing to disclose all the risks associated with Cryptonomics' business model and instead advertising that Plaintiffs could receive up to a 6000% return on their investments; (ii) falsely reporting that their investors were receiving profits from their investments; (iii) deliberately concealing the investment commingling between Evdokimov's companies and Cryptonomics, specifically, Evdokimov's ownership in Decenturion and ICOBox, and failing to disclose the same; (iv) reneging on promises to return unprofitable investments in Cryptonomics back to Plaintiffs after they made such a demand; (v) prematurely ending Cryptonomics' operations without properly informing or refunding Plaintiffs' investments; (vi) deliberately investing in financially unsound and unregistered ICOs, including an ICO that was defunct in a matter of months; and (vii) intentionally failing to comply with U.S. securities regulations in regard to registration.

The Defaulted Defendants knew their representations and promises were false when they made them. Under the *Howey* test, the Defaulted Defendants' business model is a clear example of an investment contract that falls under the purview of federal securities laws: the Defaulted Defendants misled Plaintiffs to invest in a common enterprise (Cryptonomics), expecting that Cryptonomics and its alleged experts would choose financially sound ICOs; the Defaulted Defendants' chosen ICOs were, in turn, supposed to generate profits for Plaintiffs. The Defaulted Defendants were well aware that they were selling unregistered securities as unregistered brokers but failed to take any appropriate steps to ensure compliance with the U.S. federal securities laws. The Defaulted Defendants

intended that Plaintiffs rely in good faith on their representations, and Plaintiffs did rely upon such misrepresentations and false promises by investing with Defendants.

The Defaulted Defendants also failed to disclose all the risks associated with Cryptonomics' business model, and instead repeatedly made false statements regarding the profitability and guaranteed success of their Portfolios.  One example token, Decenturion, collapsed within a matter of months.  Defendant Evdokimov also concealed his ownership interest in Decenturion.

Instead of refunding Plaintiffs' investments, the Defaulted Defendants abruptly ended Cryptonomics' operations.  The Defaulted Defendants duped Plaintiffs with promises of profitable returns, which the Defaulted Defendants knew to be false, and failed to reveal the true nature of Cryptonomics' business scheme: financially unstable ICOs, a self-interested founder, and a non-existent likelihood of successful investments.   Their deceptions constitute material omissions of fact in clear violation of Sections 10(b) and Rule 10b-5.

Furthermore, Evdokimov, as the founder and operator of Cryptonomics, violated Section 20(a).  He was the public face of the company and managed and controlled its operations, directly promoted the use and investment of Cryptonomics.  He exercised his power and influence over Cryptonomics, to cause these material misrepresentations and omissions in connection with Plaintiffs' investments with Cryptonomics.

***Sections 5 and 12(a)(1) Violations.*** Section 12 of the Securities Act of 1933, "provides that a person who sells a security in violation of §5 [of the Act] or by means of a registration statement containing material misrepresentations or omissions should be liable to the buyer in an action for rescission or damages." *Murphy*, 626 F.2d at 650.  A defendant is liable under Section 12 "if his acts were both necessary to and a substantial factor in the sales transaction."  *Id.* at 650 ("but for the defendant's participation, the sale transaction would not have taken

place.").  Section 5, in turn, forbids the offer or sale of unregistered securities in interstate commerce. *See SEC v. CMKM Diamonds*, 729 F.3d 1248, 1255 (9th Cir. 2013); *see also SEC v. Wallace*, No. 16-CV-1788-AG-FFM, 2017 WL 8230026, at *4 (C.D. Cal. May 8, 2017).  Liability under Section 5 is "not confined only to the person who passes title to the security" but also includes "persons other than sellers who are responsible for the distribution of unregistered securities." *Murphy*, 626 F.2d at 649.

Here, the Defaulted Defendants actively solicited investors to invest in unregistered securities.  As Plaintiffs have established a prima facie violation of Sections 5 and 12, the Defaulted Defendants bear the burden of proving that an exemption to the registration requirement applies.  *San Francisco Residence Club, Inc. v. Amado*, 773 F. Supp. 2d 822, 831 (N.D. Cal. 2011).   The Defaulted Defendants have not answered the First Amended Complaint and have failed to provide any contradictory showing.

***Section 15 Violations.*** Section 15(a) of the Exchange Act requires brokers or dealers who "effect any transaction in, or induce the purchase or sale of, any security" to be registered with the SEC. 15 U.S.C. § 78o(a); *see also SEC v. Wayland*, No. 17-CV-1156-AG-DFM, 2019 WL 2620669, at *4 (C.D. Cal. Apr. 8, 2019). "The term 'broker' includes any person engaged in the business of effecting transactions in securities for the account of others." Scienter is not required to prove a violation of Section 15(a). *See SEC v. Mogler*, No. 19-CV-1814-PHX-SPL, 2020 WL 1065865, at *9 (D. Ariz. Mar. 5, 2020); *SEC v. Interlink Data Network*, No. 93-CV-3073-R, 1993 WL 603274, at *8 (C.D. Cal. Nov. 15, 1993).

The Defaulted Defendants acted as unregistered brokers.  They actively solicited investors to invest with Cryptonomics, who would in turn invest in unregistered securities.  The Defaulted Defendants offered Cryptonomics' investing services on its website and social media accounts, sharing Decenturion's

promotional materials and ways to invest through Cryptonomics.  They advised potential investors about investing and enabled investors to invest in cryptocurrency, thereby acting as the link between the ICOs and investors.  The Defaulted Defendants charged investors for their services and held themselves out as brokers.  However, they never sought registration.

*Common Law Fraud.*  In order to plead common law fraud, a plaintiff must show "a false representation, knowledge of its falsity, intent to defraud, justifiable reliance, and damages." *Vess v. Ciba-Giegy Corp.*, 317 F.3d 1097, 1105 (9th Cir. 2003); *Xueying Zhai v. Hongjie Zhang*, No. 17-CV-4946-SJO-RAO, 2018 WL 6137609, at *5 (C.D. Cal. Nov. 5, 2018). As set forth above in relation to the Defaulted Defendants' violations of Section 10(b) and Rule 10b-5, the Defaulted Defendants knowingly made false representations and omissions concerning investment opportunities with Cryptonomics. The Defaulted Defendants knew these representations and promises were false when they made them.  The Defaulted Defendants intended that Plaintiffs rely in good faith on their representations, and Plaintiffs did rely upon such misrepresentations and false promises by investing with Evdokimov and Cryptonomics.  And as a direct and foreseeable result of the Defaulted Defendants' misrepresentations, Plaintiffs have been injured and harmed.

### 3. The Damages Sought are Proportionate to the Defaulted Defendants' Conduct

For the fourth *Eitel* factor, "the court must consider the amount of money at stake in relation to the seriousness of Defendant's conduct." *PepsiCo*, 238 F. Supp. 2d at 1176.  Here, Plaintiffs seek compensatory damages of $8,717,497.45, comprised of the original investment that was not returned, plus the amount of the return the Defaulted Defendants guaranteed, and punitive damages in relation to the Defaulted Defendants' fraudulent behavior.

RENEWED MOTION FOR DEFAULT JUDGMENT

#### 4.  There Is No Possibility of Disputed Material Facts

The fifth *Eitel* factor considers the possibility of a dispute as to any material facts in the case.  Upon entry of default, all well-pleaded facts in the complaint are taken as true, except those relating to damages.  *TeleVideo Sys.*, 826 F.2d at 917-18.  As explained above, the Amended Complaint's allegations establish that the Defaulted Defendants committed fraud and violated federal securities laws.  Once litigated, those allegations would be supported by substantial evidence, as clearly demonstrated by the affidavits submitted herewith from Messrs. Anaykin and Bondarev, which set forth their damages.  The Defaulted Defendants, who have failed to appear in this action, would not be able to refute this clear evidence supporting Plaintiffs' allegations. *Id.*

#### 5.  The Defaulted Defendants' Default Was Not Due to Excusable Neglect

The sixth *Eitel* factor considers whether a defendant's default may have resulted from excusable neglect.  Proper service militates against a finding of excusable neglect.  *See Landstar Ranger*, 725 F.Supp.2d at 922; *see also Xerox Corp. v. Am. Mail Ctrs., Inc.*, No. 16-CV-42-DOC-KES, 2016 WL 10835982, at *4 (C.D. Cal. July 20, 2016) ("where the defendants were properly served with the Complaint, the notice of entry of default, as well as the papers in support of the instant motion, this factor favors entry of default judgment.") (internal quotation marks and citations omitted).

Here, Plaintiffs made multiple attempts to personally serve Evdokimov and Cryptonomics.  Dkt. No. 27.  When it became clear that those efforts would be, the Court allowed Plaintiffs to serve Evdokimov and Cryptonomics by publication. Dkt. No. 31.  For four consecutive weeks, Plaintiffs effected service on Evdokimov and Cryptonomics by the publication of the Summons in the Los Angeles Times and through the Defaulted Defendants' respective Facebook, LinkedIn, Twitter, Instagram, and Telegram sites. Dkt. No. 32 ¶ 12.  Plaintiffs' counsel also e-mailed

the Summons to Evdokimov's last known e-mail address.  *Id.* ¶ 8.  Plaintiffs completed service by publication on the Defaulted Defendants on March 25, 2020. Dkt. No. 32.  Plaintiffs' multiple service attempts were in full compliance of the Federal Rules and the Court's February 28, 2020 Order.  Dkt. No. 31.

Given that over a year has passed since the entry of defaults against Evdokimov and Cryptonomics, the Defaulted Defendants have had more than a sufficient amount of time to answer the First Amended Complaint.  Yet, the Defaulted Defendants have failed to make an appearance.  The Defaulted Defendants' inaction since September 20, 2019, preclude a finding of excusable neglect.

### 6. The Policy Favoring Decisions on the Merits Does Not Preclude Default Judgment Against the Defaulted Defendants

The seventh *Eitel* factor recognizes the federal policy favoring disposition of cases on their merits "whenever reasonably possible."  *See Eitel*, 782 F.2d at 1472.  Nonetheless, "this preference, standing alone, is not dispositive," and thus "the preference to decide cases on the merits does not preclude a court from granting default judgment."  *PepsiCo*, 238 F. Supp. 2d at 1177 (internal quotation marks and citations omitted); *Vogel v. Rite Aid Corp.*, 992 F. Supp. 2d 998, 1013 (C.D. Cal. 2014) (same).  Indeed, a party's failure to answer a pleading "makes a decision on the merits impractical, if not impossible."  *PepsiCo*, 238 F. Supp. 2d at 1177.  Since the Defaulted Defendants failed to make any appearance in this action, a dispositive decision on the merits is impossible.  Therefore, the seventh *Eitel* factor should not preclude the Court from entering a default judgment against Evdokimov and Cryptonomics.

### C. Plaintiffs Are Entitled to the Damages Sought

In calculating damages on a motion for default judgment, the Court takes all of Plaintiffs' well-pleaded allegations of injury as true.  *TeleVideo Sys.*, 826 F.2d at 917.  General allegations of damages in a prayer for relief are sufficient to

support a default judgment, so long as the defendant is given reasonable notice thereby of the amount at stake. *Henry v. Sneiders*, 490 F.2d 315, 317 (9th Cir. 1974).

Plaintiffs seek $8,717,497.45 in compensatory damages, which represent the monies actually invested and the monies that were supposed to be returned to Plaintiffs.

In the Amended Complaint, Plaintiffs alleged that, based on the information available at the time, Anaykin's total investments were in the amount of $948,859.07.  Based upon a re-review of the documentary evidence in preparation for this motion, Anaykin discovered that these investments actually totaled $978,863.99, a difference of about $30,000.  However, in adherence to Rule 54(c), Anaykin will not seek this additional $30,000 amount, and instead will adhere to the $948,859.07 investment amount set forth in the Amended Complaint.

Anaykin's deposits are evidenced by screenshots from Blockchain.com. *See* Anaykin Decl. ¶¶ 4-6 Ex. 1.  (Because a transaction on the Bitcoin blockchain leaves an immutable public record, parties with knowledge of a particular wallet address can trace all such transactions, which are recorded for public viewing on a website, Blockchain.com. *See* Gottlieb Decl. ¶ 17.   Anaykin's screenshots demonstrate that he made multiple deposits with the Defaulted Defendants, totaling $978,863.99.  Similarly, Bondarev deposited $121,600 with Cryptonomics. *See* Bondarev Decl. ¶ 5.

Based upon the Defaulted Defendants' promises and advertisements, Plaintiffs both expected a return of up to 700%.  Plaintiffs now seek to recover the value of their investments plus that return guaranteed by the Defaulted Defendants – a total of $8,717,497.45.  This amount is supported by statute and case law in a matter such as this.  Under Cal. Civ. Code § 3333, "for the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the

21

1   detriment proximately caused thereby, whether it could have been anticipated or
2   not."   When as here, where a defendant and plaintiff stand in a fiduciary
3   relationship, damages for defendant's fraud will be measured pursuant the benefit-
4   of-the-bargain rule. *Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1240
5   (1995). "The 'benefit-of-the-bargain' measure ... is concerned with satisfying the
6   expectancy interest of the defrauded plaintiff by putting him in the position he
7   would have enjoyed if the false representation relied upon had been true; it awards
8   the difference in value between what the plaintiff actually received and what he
9   was fraudulently led to believe he would receive." *Id.* at 1240.

10         In *Alliance*, plaintiff alleged that the defendants' intentional false
11   misrepresentations regarding the characteristics and values of certain properties
12   induced plaintiff to issue loans and purchase properties. The California Supreme
13   Court explained that:

> In fraud cases involving the 'purchase, sale or exchange of
> property,' the Legislature has expressly provided that the
> "out-of-pocket" rather than the "benefit-of-the-bargain"
> measure of damages should apply. <u>This section [§ 3343]
> does not apply, however, when a victim is defrauded by its
> fiduciaries.  In this situation, the "broader" measure of
> damages provided by sections 1709 and 3333 applies.</u>

20   *Id.* at 1240-41 (emphasis added).

21         Here, Evdokimov, using Cryptonomics, held himself out as Plaintiffs'
22   broker-dealer.  As their broker-dealer, Evdokimov owed Plaintiffs a fiduciary duty
23   to not place his interests over those of his clients. *Mihara v. Dean Witter & Co.*,
24   619 F2d 814, 822 (9th Cir. 1980).   Instead, Evdokimov and Cryptonomics
25   intentionally made false representations to Plaintiffs regarding the profitability of
26   Plaintiffs' investments.   Their actions not only led to Plaintiffs' doomed
27   investments, but resulted in millions of dollars in damages.  As Plaintiffs and
28   Evdokimov were in a fiduciary relationship, Plaintiffs are entitled to damages

calculated pursuant to the benefit-of-the-bargain measure of damages. With Plaintiffs' investments, plus Anaykin's bonus (2.631 Bitcoin), combined with the returns Evdokimov fraudulently led Plaintiffs to believe they would receive, Plaintiffs are entitled to $8,717,497.45 in compensatory damages.

Plaintiffs also seek punitive damages. Under prevailing Ninth Circuit law, in making a determination regarding an award of punitive damages, the Court should consider (1) the nature of defendants' acts; (2) the amount of compensatory damages awarded; and (3) defendants' wealth. *See Prof'l Seminar Consultants, Inc. v. Sino Am. Tech. Exch. Council, Inc.*, 727 F.2d 1470, 1473 (9th Cir. 1984) (evaluating standard in the context of a default judgment and affirming award of punitive damage award); *see also Guadarrama v. Chadorbaff*, No. 17-CV-605-DOC-JDE, 2018 WL 5816191, at *10-12 (C.D. Cal. Apr. 30, 2018). In California, a plaintiff must show, by clear and convincing evidence, that the defendant acted with oppression, malice, or fraud in order to obtain punitive damages. *See* Cal. Civ. Code § 3294; *Kaffaga v. Estate of Steinbeck*, 938 F.3d 1015-16 (9th Cir. 2019). Fraud, per California Civil Code section 3294(c)(3), is defined as "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."

Here, there is substantial evidence to support an award of punitive damages. The reprehensibility of the Defaulted Defendants' actions is unmistakable. As previously stated, the Defaulted Defendants knowingly misrepresented the profitability of the chosen ICOs and duped Plaintiffs into purchasing unregistered securities for Evdokimov's benefit and Plaintiffs' detriment. The Defaulted Defendants purposefully targeted investors who had little knowledge of the cryptocurrency market. As seen in *SEC v. ICOBox*, the Defaulted Defendants have done this before; taking advantage of innocent investors, making promises of favorable returns, and refusing to return any investments. Punitive damages are

intended to promote deterrence, *see Arizona v. Asarco LLC*, 773 F.3d 1050, 1059 (9th Cir. 2014), and when, as here, the Defaulted Defendants have repeatedly engaged in fraudulent conduct, an award of punitive damages is appropriate, as a deterrent to similar behavior by the Defaulted Defendants (or others) in the future. Plaintiffs thus respectfully suggest that an amount of punitive damages of $8,717,497.45 (equal to the amount that was promised to Plaintiffs in return for their investment), are appropriate in this case.

Plaintiffs are also entitled to prejudgment and post-judgment interest on their common law claim for fraud. California Civil Code section 3287(a) provides for prejudgment interest on a fraud claim when damages are "certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day…." Cal. Civ. Code § 3287(a); *see also* Cal. Civ. Code § 3288 (permitting prejudgment interest "in every case of … fraud"). California's default legal interest rate is 7% per annum. Cal. Const. Art XV, § 1. Whether pre-judgment interest should be awarded lies within the discretion of the trial court. Cal. Civ. Code § 3288.

Here, the right to recover vested in each Plaintiff on the date he was defrauded. To be conservative, Plaintiffs propose using August 27, 2018, as the accrual date for prejudgment interest, as this was the last date on which either Plaintiff invested in Cryptonomics. *See* Gottlieb Decl. ¶ 18. Prejudgment interest (at California's default legal interest rate of 7% per annum) on the amount of $8,717,497.45, from August 27, 2018 through June 11, 2021, is $1,709,462.80. That amount will increase by $1,671.85 per day thereafter, through the date of judgment. *See id*.

Likewise, Plaintiffs are also entitled to an award of post-judgment interest. "Under the provisions of 28 U.S.C. § 1961, post-judgment interest on a district court judgment is mandatory." *Air Separation, Inc. v. Underwriters at Lloyd's of*

1    *London*, 45 F.3d 288, 290 (9th Cir. 1994) (citation omitted); *see also Landstar*

2    *Ranger*, 725 F.Supp.2d at 924.  The post-judgment interest rate is set "at a rate

3    equal to the weekly average 1-year constant maturity Treasury yield, as published

4    by the Board of Governors of the Federal Reserve System, for the calendar week

5    preceding ... the date of the judgment."  28 U.S.C. § 1961(a).

6    **IV.   <u>CONCLUSION</u>**

7            For the foregoing reasons, Plaintiffs Vitaly Anaykin and Konstantin

8    Bondarev respectfully request that the Court grant their renewed application for

9    entry of default judgment, and award the requested relief: compensatory damages

10   in the amount of $8,717,497.45; punitive damages in the amount of $8,717,497.45;

11   prejudgment interest of $1,709,462.80 (increasing by $1,671.85 per day thereafter,

12   through judgment); and post-judgment interest as provided by law from the date

13   of entry of judgment until the date the judgment is paid in full.

14

15   Dated: June 11, 2021                    Respectfully submitted,

16                                            MORRISON COHEN LLP

17                                            By:    */s/ Jason Gottlieb*
                                                     Jason Gottlieb (*pro hac vice*)
18                                                   Modupeolu Adegoke (*pro hac vice*)

19                                            HANUSZ LAW, PC

20                                            By:    */s/ John Hanusz*
                                                     John Hanusz
21
                                              Attorneys for Plaintiffs Vitaly Anaykin
22                                            and Konstantin Bondarev

23

24

25

26

27

28

RENEWED MOTION FOR DEFAULT JUDGMENT